DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| UNITED STATES OF AMERICA, and THE PEOPLE OF THE VIRGIN ISLANDS<br><br>        Plaintiffs,<br><br>        v.<br><br>ENRIQUE SALDANA, GEORGE GREENE, JR., and LOUIS ROLDAN,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   Criminal No. 2009-32<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

ATTORNEYS:

**Kim R. Lindquist, AUSA**
**Nolan D. Paige, AUSA**
St. Thomas, U.S.V.I.
    *For the plaintiffs.*

**Darren John-Baptiste, Esq.**
**Joseph A. DiRuzzo, III, Esq.**
St. Thomas, U.S.V.I.
    *For the defendant Enrique Saldana.*

**Thurston T. McKelvin, FPD**
**Gabriel Villegas, AFPD**
St. Thomas, U.S.V.I.
    *For the defendant George Greene.*

**George H. Hodge, Jr., Esq.**
St. Thomas, U.S.V.I.
    *For the defendant Louis Roldan.*

## MEMORANDUM OPINION

**GÓMEZ, C.J.**

Before the Court are the motions of defendants Enrique Saldana ("Saldana"), George Greene, Jr. ("Greene"), and Louis Roldan ("Roldan") (jointly, the "defendants") for a new trial. The defendants claim they were denied their Sixth Amendment right to a public trial. The government opposes the defendants' motions.

## I. FACTS

The facts of the underlying criminal charges in this matter are of little moment to the constitutional question presented. In short, Saldana and Greene are members of the Virgin Islands Police Department, who, along with Roldan, were charged with conspiring to extort a cash payment from a dealer of fake narcotics (the "extortion matter"). Greene was also charged with firearms violations (the "firearms matter"). Greene's gun charges were severed from the other charges in the indictment.

The defendants move for judgments of acquittal on substantive grounds. Those motions will be addressed in a separate opinion. For purposes of this opinion, the Court will consider only the defendants claim that the public was excluded from the trial in this matter, resulting in Sixth Amendment

violations.  As a result, they seek new trials.  The government

asserts that the defendants forfeited their Sixth Amendment

claims by not raising the objections at trial.

The parties' positions on the alleged Sixth Amendment

violations are relatively clear.  There is anything but clarity

on review of the relevant facts, however.  On the one hand, the

defendants have captured and presented clear evidence that

several individuals were under the impression that they were not

to be in the courtroom at certain times.  Unearthing the bases

for that impression is far more elusive.  The Court's task is

confounded because some of the witnesses presented by the

defendants testified about a version of events that either:

conflicts with other defense witnesses; conflicts with government

witnesses; or is internally inconsistent. Notwithstanding those

conflicts, the record reveals the following.

The extortion matter proceeded to trial in December of 2009.

The jury was unable to reach a verdict, and the Court declared a

mistrial.

On January 20, 2010, Greene's firearm matter proceeded to

trial.  Greene was convicted on the gun charges.

On January 25, 2010 the extortion re-trial of all three

defendants began.  The jurors were summoned to be at the

courthouse at 8:00 a.m. Jury attendance proceeded from that time

until 10:00.  At the conclusion of jury attendance, the judge was called to the courtroom. Jury selection in the extortion retrial commenced at approximately 10:00 a.m and ended at 11:47 a.m.

On January 28, 2010, while the extortion trial was ongoing, Greene filed a motion for a new trial on the gun charges.  He claimed members of the public were excluded from the courtroom during *voir dire*.  In support of that allegation, Greene submitted the affidavits of two of his family members, one of which was later withdrawn as inaccurate.

On January 29, 2010, after a five-day re-trial in the extortion matter, the defendants were convicted on nearly all of the charges that went to the jury.[1]  On February 12, 2010, both Greene and Saldana filed motions for a new trial, claiming that members of the public were denied access to the courtroom during *voire dire* of the extortion re-trial.  Roldan later joined those motions.

The Court held an evidentiary hearing to determine whether the public was excluded from the courtroom during the jury selection for the gun trial[2] or the extortion re-trial.  At that

_____

[1] Greene was acquitted of making a false statement and of money laundering.

[2] Judge John E. Jones presided over the gun trial. On July 6, 2010, Judge Jones  issued a Memorandum Opinion and Order addressing the Sixth Amendment public trial issue with respect to the gun trial. This Memorandum Opinion addresses the public exclusion challenge with respect to the extortion

hearing, which spanned two days, all three defendants called witnesses, as did the government, and the Court itself.

Several witnesses testified that they were told that they could not enter or remain in the courtroom on the morning of January 25, 2010. Lorecia Krigger-Stephens ("Krigger-Stephens"), whose niece is engaged to Greene, testified that when she was sitting in the courtroom, she was told by someone who she believed to be court personnel "You all can't be there" and was ushered out of the courtroom. (Hr'g Tr. 71, May 12, 2010.) Earl Harrison ("Harrison"), Greene's minister, and his assistant, Lerone Hodge ("Lerone Hodge"), testified that they were with Krigger-Stephens when they were barred from the courtroom. Hodge stated that while entering the courtroom, he was approached by an individual who asked if they were jurors and upon his response of no, it was suggested that they leave the courtroom. (*Id.* at 41.) Harrison testified that he was asked if they were family members, and was told that unless he was a family member he had to leave th courtroom. (*Id.* at 32.)

Albert H. Richards Sr. ("Mr. Richards"), brother-in-law of Saldana, testified that an individual who was calling out jurors' names asked if he was a prospective juror. (*Id.* at 154.) After

---

retrial.

he responded that he was not a prospective juror, she told him he had to leave. (*Id.* at 155.)  Jeanette Magras-Saldana ("Mrs. Saldana"), wife of defendant Saldana, testified that she accompanied Richards and his wife, Felicita Saldana Richards ("Mrs. Richards") to court on January 25, 2010 (*Id.* at 198). Mrs. Saldana testified that she was stopped before she was able to get through the second courtroom door and was told that she, Mr. Richards, and Mrs. Richards, could not enter the courtroom. (*Id.* at 201.)

 Mr. Greene's brother, Curtis Fredericks ("Fredericks") testified that someone he believed was a marshal told him he could not enter the courtroom on January 25, 2010. (*Id.* at 101.)

Other individuals testified that they saw a group of family members and acquaintances waiting outside the courtroom and upon hearing that these people had been denied entry, joined them in waiting to be allowed entry into the courtroom. (*Id.* at 88, 180.)

Though the testimony differs about the length of time during which individuals were barred from the courtroom, several individuals testified that they gained entry to the courtroom some time later that day without incident.

The Court also heard testimony from court staff and court

security officers[3] ("CSOs").  The court staff testified about

both general practices of preparing and assembling a jury panel

for jury selection as well as activities performed on January 25,

2010. CSO Hyram Graneau testified that on January 20, 2010 he

told Fredericks that the courtroom was full and there was no

available seating. (*Id.* at 295.)  None of the CSOs testified that

they had any similar conversation with a member of the public on

January 25, 2010. CSO Alfredo James ("James") testified that he

generally sought to keep the public separate from prospective

jurors as part of his routine duties as a CSO.  When asked if he

carried out his perceived duty "to ensure that no member of the

public was commingled with the jury panel" on January 25, 2010 he

said he did, but did not testify that as part of fulfilling his

duty he carried out any exclusion on that day. (*Id.* at 252-53)

     The defendants now claim that there was an exclusion of

individuals from the courtroom that violated their Sixth

Amendment right to a public trial.

### III. <u>ANALYSIS</u>

     Pursuant to Federal Rule of Criminal Procedure 33[4], "a

---

[3]CSOs are not part of the Court's staff.  They are under contract with
the U.S. Marshal Service, an agency under the executive branch.  They have a
role to play, but are not part of the judiciary.

[4]In pertinent part, Federal Rule of Criminal Procedure 33 provides:
"Upon the defendant's motion, the court may vacate any judgment and grant a
new trial if the interest of justice so requires." Fed. R. Civ. P. 33(a).

district court 'can order a new trial . . . only if it believes

that there is a serious danger that a miscarriage of justice has

occurred — that is, that an innocent person has been convicted.'"

*United States v. Davis*, 397 F.3d 173, 181 (3d Cir. 2005) (quoting

*United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)).

Further, the "burden is on the defendant to show that a new trial

ought to be granted." *United States v. Clovis*, 1996 U.S. Dist.

LEXIS 20808, at *5.

The Sixth Amendment provides: "In all criminal prosecutions,

the accused shall enjoy the right to a speedy and public trial. .

. ." U.S. CONST. AMEND. VI.  The assurance of a public trial "'is

for the benefit of the accused; that the public may see he is

fairly dealt with and not unjustly condemned, and that the

presence of interested spectators may keep his triers keenly

alive to a sense of their responsibility and to the importance of

their functions . . . .'" *Waller v. Georgia*, 467 U.S. 39, 46

(1984) (*quoting Gannett Co., Inc. v. DePasquale*, 443 U.S. 368,

380 (1979).

However, the Supreme Court in *Waller v. Georgia*, 467 U.S. 39

(1984), also recognized that the right to a public trial is not

absolute.  In some instances it must yield to other interests,

such as those essential to the administration of justice. *Id*. at

45. To ensure that lower courts strike the proper balance of

interests, the Court adopted the following requirements: 1) a

party seeking to close a court proceeding must advance an

overriding interest that is likely to be prejudiced; 2) the

closure must be no broader than necessary to protect that

interest; 3) the trial court must consider reasonable

alternatives to closing the proceeding; and 4) it must make

findings adequate to support the closure. *Id*. at 48. Prior to

embarking on a *Waller* analysis, "we must first determine whether

the right attaches" in the circumstances at hand. *United States

v. Ivester*, 316 F.3d 955, 958 (9th Cir. 2003).

It is axiomatic that a defendant's Sixth Amendment right to

a public trial attaches from the commencement of trial, at voir

dire. *Presley,* 130 S. Ct. at 724. Beyond a trial, there are few

circumstances where the Sixth Amendment right to a public trial

attaches*. See Waller*, 467 U.S. at 47 (recognizing the accused's

right to public access to his pretrial suppression hearing). *But

See Levine v. United States* ("Criminal contempt proceedings are

not within 'all criminal prosecutions' to which that Amendment

applies.")(citations omitted).

Here, the defendants specifically assert that members of the

public were excluded from *voir dire* and jury selection.  They

highlight the Supreme Court's recent discussion in *Presley v.*

*Georgia*, 130 S. Ct. 721 (2010), noting that *voir dire* is a

segment of a criminal prosecution firmly within a defendant's

right to a public trial*.*  Their argument, however, is belied by

two obstacles.  First, the alleged closure was neither Court

ordered nor Court directed.  Second, it is unclear in the record

if the alleged closure occurred during a judicial proceeding to

which the Sixth Amendment attaches.

In most cases where a defendant alleges that his Sixth

Amendment right to public trial has been violated, a courtroom

closure has been a readily apparent product of a court order or a

court-directed protocol. *See, e.g.*, *United States v. Thunder*, 438

F.3d 866, 868 (8th Cir. 2006)(noting that a "total closure" of

the courtroom occurred when the trial court granted government's

motion for such closure during the testimony of alleged victims

of aggravated sexual abuse); *Bowden v. Keane*, 237 F.3d 125, 128

(2d Cir. 2001) (detailing a closure that occurred after a trial

judge granted the prosecution's motion for closure of the

courtroom during an undercover witness' testimony); *United States*

*v. DeLuca*, 137 F.3d 24, 32-34 (1st Cir. 1998)(finding that the

marshal service's screening policy, requiring that all court

spectators provide written identification before being permitted

to enter the courtroom, amounted to a "partial closure"). Here,

the Court issued no order closing the courtroom or directing any

court personnel to effectuate such a closure.

Where, as here, there is no record of a directive from the

Court, a closure is still possible. *See, e.g.*, *United States v.

Al-Smadi*, 15 F.3d 153, 155 (10th Cir. 1994) (describing a closure

that occurred because it was the regular practice of the federal

courthouse to close to the public at 4:30 p.m., and in the

challenged instance, the court security officer failed to ensure

the courthouse doors remained open past 4:30, even though a trial

was in progress); *Martineau v. Perrin*, 601 F.2d 1196, 1200 (1st

Cir. 1979)(finding a closure where "due to a misunderstanding by

the court officer, the courtroom doors were locked for three days

and part of a fourth of a six day trial"). Under those

circumstances, determining whether an exclusion occurred requires

a careful inquiry into the allegations presented and the

circumstances under which an exclusion may have taken place.

In *United States v. Lipscomb*, 539 F.3d 32 (1st Cir. 2008),

the Court of Appeals for the First Circuit found that a defendant

did not adequately demonstrate that a violative closure had

occurred.  The defendant offered as proof of closure, an unsworn

letter from an individual claiming he was barred from closing

arguments.  The letter read: "'On the date of 10-5-05 I went to
the federal court building to attend the closing arguments for
Anthony Lipscomb.  Arriving alittle [sic] late, when I got to the
court room the door was locked and I wasn't able to enter.'"
*Lipscomb*, 539 F.3d at 42.

The First Circuit found Lispcomb's evidence of a closure
wanting.  It did not consider an "unsworn and unsubstantiated
declaration, alone . . . sufficient competent evidence to
demonstrate that Lipscomb's Sixth Amendment right to a public
trial was violated." *Id.* at 43.  The Court further noted that the
defendant did not allege that the closure was "intentional or
that it occurred during the evidentiary phase of his trial . . .
. at most, the closure occurred after the end of witness
testimony and the submission of trial evidence." *Id.*

The defendants here have presented sworn testimony and
accounts of closure that exceed the conspicuously deficient
proffer in *Lipscomb*.  At the same time, however, their evidence
of exclusion does not rise to the quantum or quality of
definiteness found in cases in which closure was apparent on the
record.  Rather, this case falls somewhere in between those two
examples.

The defendants have filed affidavits of family members and
other members of the public which assert that those individuals

attempted to enter the trial on January 25, 2010 and were denied

admittance by U.S. marshals or court room security officers.

Those affidavits speak about the challenged closure in general

terms, lacking specificity about the manner in which individuals

were barred from the courtroom.  For example, in his affidavit

Mr. Richards asserts that:

> 3. On Monday, January 25, 2010, I attempted to enter
> the Courtroom during the jury selection and/or *voire
> dire* for the above-referenced case.
> 4. I was not permitted to enter the Courtroom during
> jury selection and/or *voire dire.*
> 5. I was permitted to enter said Courtroom only after
> the jury selection and/or *voire dire.*

(Aff. of Albert Richards, Attach. 2, Saldana Mot. for J. of
Acquittal, Mot. New Trial.)

The other affidavits filed similarly pinpoint *voir dire* as the

time when individuals were barred from the courtroom.

However, at the Court's evidentiary hearing, there was no

consensus in the testimony of witnesses who had an opportunity to

observe what was happening in the Court at the time of their

alleged exclusion[5].  Krigger-Stephens testified that she did not

---

[5]Some of the witnesses gave speculative testimony about what occurred in
the courtroom while they were allegedly excluded. For example, Mrs. Saldana
testified that she was aware of what she was unable to witness during her
exclusion because of her experience attending the first trial in this matter:

> Because during the December 14[th] trial, I was here, I saw the
> entire jury selection process.  I was sitting right there.  I saw
> everything.  So this was only my second trial.  I assumed the same
> way I was allowed in the first time I should have been allowed in
> the second time.  And I wasn't.

"remember the time, but I know the same time when you come, like
we were supposed to come to, for trial, it was, I think it was a
Monday."(*Id.* at 103.)  Mrs. Richards stated that when she arrived
at 9:45 a.m. on June 25, 2010, family members were standing
outside the courtroom and communicated  that they had been
excluded from the courtroom. (*Id.* at 180.)  Mrs. Saldana
testified that on January 25, 2010 she arrived at the courthouse
at approximately 9:00 a.m., and was precluded from entering the
courtroom at that time. (*Id.* at 198, 201.)

The testimony about the length of time of the alleged
exclusion is similarly varied.  Harrison testified that about an
hour passed in between the time when he was urged to leave the
courtroom and when he was told he was able to reenter the
courtroom. (*Id.* at 21-22.) However, his assistant who accompanied
him that day, Lerone Hodge, testified that he could not recall
exactly what he did after he was barred from the courtroom, he
and Harrison may have gone to lunch and then entered the
courtroom in the afternoon without incident. (*Id.* at 48, 51).
Krigger-Stephens, who testified that she had been excluded at the
same time as Harrison and Lerone Hodge, at one point testified
that she did not think the exclusion lasted "longer than five

---

(Hr'g Tr. 205, May 12, 2010.)

minutes," but then later stated that after she had been denied

entry, she remained outside the courtroom for "longer than 15

minutes." (*Id.* at 76-77.)   Mrs. Saldana testified that her

exclusion lasted "[a]t least two hours."(*Id.* at 207.) Mr.

Fredericks stated that "I can't give a number, but me -- more

than a hour." (*Id.* at 111.)

The Court notes that prior to jury selection beginning,

Court staff take attendance when assembling the jury panel. The

Court's jury clerk, Kimberly Willett, described the general jury

attendance procedure as follows:

> THE COURT: When you say attendance is taken, what do
> you mean by that?
> Tell us what you observe occurs or what you do.
>
> THE WITNESS: The jurors are called by their names, and
> they proceed to the table and receive their Juror
> Number.
>
> THE COURT: Tell us what else, if anything happens at
> that stage?
>
> THE WITNESS: After they receive their number they go
> back to their seats, and then after the whole jury --
> everyone has received a number, then a random seating
> list is, is created within the system.  And then I
> would come in and do my bio form.
>      We distribute the paperworks to the attorneys and
> we await for the judge to come in after all the parties
> are called -- the parties, meaning the attorneys.

(Hr'g Tr. 18-19, May 18, 2010.)

In this Court, jury attendance is an administrative

undertaking performed by Court staff, much like the assignment of

juror numbers.  It takes place before the trial starts. No judge

conducts jury attendance. Following the completion of jury

attendance, the judge is called to the bench, and then presides

over jury selection.

It is significant that none of the individuals, claiming

that they were barred from the courtroom, who had an opportunity

to observe the inside of the courtroom, referenced the judge

being present at the time of their alleged exclusions.  Ms.

Krigger-Stephens did not recall a judge being on the bench at the

time of her exclusion:

> THE WITNESS: I wasn't really paying too much
> attention. I saw people speaking, attorneys speaking,
> you know, but I wasn't really paying too much
> attention. I just came in and sit down and was waiting
> for whatever -- you know. I don't --
>
> THE COURT: When you say "speaking," were they speaking
> to a judge?
> Was there any judge in the courtroom?
>
> THE WITNESS: No, because I don't remember – that's
> what I was just about to say. I don't remember you
> being there.

(*Id.* at 75.)  Mr. Richards testified that at the time he was

urged to leave the courtroom prospective jurors' names were being

called out:

> Q: Now, drawing your attention to the second trial
> involving Mr. Enrique Saldana, do you recall whether or
> not you attended the first day of that trial?

A: Yes. I did.

Q: And what do you, what do you recall, if anything, occurred on that day?

A: After I got upstairs, I was accompanying his mother. She sat down outside, and I came -- excuse me.

Q: Go ahead.

A: And I came inside the court. When I got inside the court, all the benches were full of people. So there were no seats there.
The little gate there was open. This, where the government attorneys are sitting, was moved over to the side. There were chairs there. The podium that you're standing to was turned around. So I came in and I sat down in one of the chairs.
There was an individual calling out names. After about the fourth or fifth name, she turned to me and she said, "Are you a prospective juror?"
I said to her, "No. I'm here for the trial."
She said to me, "Well, I'm sorry, you can't be in here now. You have to leave."
So I got up and I walked out.

(*Id.* at 154.)  This testimony suggests that the exclusions of

Krigger-Stephens and Mr. Richards took place prior to *voir dire*,

while jury attendance was being conducted.[6]  The Court also finds

that for the several other witnesses claiming to be excluded

---

[6]The testimony from other witnesses who had the opportunity to observe the courtroom was vague about what was occurring prior to their exclusion. Harrison testified that he observed "[i]ndividuals gathering," when he entered the courtroom. (Hr'g Tr. 21, May 12, 2010.) Lerone Hodge testified that counsel was present but he did not recall any witnesses on the stand. When asked what he observed the people in the courtroom doing, he responded "[t]hey were just sitting." (*Id.* at 47.)

during the 9:00 a.m. to 10:00 a.m. window[7], the natural inference

is that they too were merely denied access to jury attendance[8].

Further supportive of a conclusion that individuals were

excluded from jury attendance and not jury selection, is the

testimony from Fredericks that he witnessed at least a portion of

jury selection when he was permitted to reenter the courtroom

following his alleged exclusion:

> Q: What about -- did you observe any particular portion
> of that process taking place at the time that you
> entered the courtroom, that you were allowed to enter
> the room?
>
> A: What did I observe?
>
> Q: Yes.
>
> A: Well, I come in, the jury selection was in process.
> And I just sit down and, some person, a *person would
> say like, with a number, and they would say if they*

---

[7]The Court notes that Mrs. Saldana testified that she was not permitted
entry until after 11:00 a.m. In light of the testimony of other witnesses,
such as Richards and Krigger-Stephens, the Court does not find Mrs. Saldana's
testimony alone to be  persuasive evidence that the courtroom was barred to
the public until 11:00 a.m.

[8]  Testimony by some witnesses indicated that they were told that the
exclusion was for the jury selection process. Kamika Thomas ("Thomas"), fiancé
of Greene, testified that when she attempted to enter the courtroom on January
25, 2010 she was stopped by someone who told her "Well, no one is being
allowed into the courtroom until after jury selection." (Hr'g Tr. 87, May 12,
2010. Harrison testified that a guard approached him and told him that unless
he was a family member he could not remain in the courtroom during the jury
selection process. (*Id.* at 31.)  The Court notes that though many of the
witnesses linked their exclusions to the jury selection period, when
questioned further about the events of the trial they were excluded from
viewing, the witnesses had difficulty recalling what was occurring in the
courtroom at the time of their exclusion. Significantly, the general sense
from these observations is that jury attendance — not *voir dire* — was taking
place.

>        *could stay on the case, if not, if they can't stay, and*
>        *then the judge will have something to say.*

(*Id.* at 112.)(emphasis added)

Fredericks essentially described jury selection. *A fortiori*, it is apparent from the record that he attended jury selection. Thus, despite Fredericks' general claim of exclusion, it is probable that he was merely denied access from jury attendance.

The Court is unaware of any authority that would support an extension of a Sixth Amendment right to a public trial to a non-judicial event preceding trial, such as jury attendance. The Court does not find a basis upon which the defendants could validly claim they had a right to public access to the taking of jury attendance.

The Court is not insensitive to the impression of exclusion that may have emanated from the denial of the opportunity to be in the courtroom during jury attendance[9]. However, while the Sixth Amendment offers a significant guarantee of a public trial, it does not secure for the accused all-encompassing public access to pretrial Court administrative operations. For example, no one could reasonably claim that the Sixth Amendment secures the right

--------

[9] Indeed, while there was no physical space other than the courtroom to conduct jury attendance for the number of potential jurors summoned, the Court now has secured added space outside of the courtroom to conduct jury attendance.

to have the public present in the Clerk's Office during the preparation of juror summonses.  Moreover, the Court does not find that the perfunctory task of jury attendance implicates the prevailing values associated with a public trial, keeping triers of a case "'keenly alive to a sense of their responsibility and the importance of their functions . . . .'" and "encourag[ing] witnesses to come forward and discourag[ing] perjury." *Waller*, 467 U.S. at 46 (*quoting Gannett*, 443 U.S. at 380).  While the Court does not foreclose the possibility that there are non-judicial proceedings that may be so intertwined with trial proceedings that a defendant's Sixth Amendment right to public trial is applicable, the Court does not find that the administrative action of jury attendance approaches such an event.

Even assuming *arguendo* that there was an inadvertent partial closure during *voir dire,* the Court must then consider whether such closure amounted to a violation of the defendants' Sixth Amendment rights.

"In a system where public trials are the rule . . . not every improper partial closure implicates" the concern that a trial not conducted wholly before the public undermines its fundamental fairness. *Brown v. Kuhlmann*, 142 F.3d 529, 536 (1st

Cir. 2008). Several courts have found inadvertent, brief closures
not to offend an accused's Sixth Amendment right. *See, e.g.,*
*Bowden v. Keane*, 237 F.3d 125, 129 (2d Cir. 2001)(noting  that
the right to public trial "is not trammeled . . . by a trivial,
inadvertent closure"); *Al-Smadi*, 15 F.3d at 155 (determining that
the inadvertent closure of twenty minutes of trial at the end of
a court day that was "unnoticed by any of the trial
participants," did not violate the Sixth Amendment). *But See*
*Owens v. United States*, 483 F.3d 48, 63 (1st Cir. 2007)("even if
the courtroom was closed because of inattention by the judge,
courts have expressed concern in the past where a court officer's
unauthorized closure of a courtroom impeded public access.")
(citations omitted)*; Walton v. Briley*, 361 F.3d 431, 433 (7th
Cir. 2004) (finding a Sixth Amendment violation where trial ran
late into the evening, foreclosing attendance of the public,
because "[w]hether the closure was intentional or inadvertent is
constitutionally irrelevant"); *United States v. Keaveny*, No. 98-
1605, 1999 U.S. App. LEXIS 3630, at *4 (1st Cir. 1999)
("constitutional concerns may be raised even by a court officer's
unauthorized partial exclusion of the public.").

In *Peterson v. Williams*, the trial court had properly
ordered the court cleared during testimony of an undercover

police officer. 85 F.3d 39, 41 (2d Cir. 1996). Due to an

"administerial mistake" the doors were not reopened for the

defendant's testimony, which immediately followed that of the

undercover officer. *Id*. The defendant's testimony was brief, and

he denied the charges against him. *Id.* "Before summation,

defense counsel moved for a mistrial, saying that she had 'just

noticed when we stood up to start summations, that the courtroom

was being unsealed for the very first time . . . .'" *Id*.

The trial court reserved decision on the mistrial motion,

and later made the following findings of fact: (1) the closure

was an administerial mistake, (2) the defendant's testimony was

only 15 or 20 minutes long (3) court officers opened the door for

individuals who sought entry upon hearing someone at the door,

and (4) the individuals who were asked to leave and later sought

re-entry were not associated with the case, but were individuals

who often visit courtroom. *Id*. at 41-42.

On review, the Second Circuit articulated a widely cited and

followed "triviality standard,"[10] saying,

> the unjustified closure that occurred was too trivial
> to amount to a violation of the Amendment. A triviality
> standard, properly understood, does not dismiss a
> defendant's claim on the grounds that the defendant was

---

[10] This nomenclature is unfortunate. While this Court might prefer to
refer to a *de minimis* standard, the *Peterson* "triviality standard" is
frequently referred to by federal courts.

> guilty anyway or that he did not suffer "prejudice" or
> "specific injury." It is, in other words, very
> different from a harmless error inquiry. It looks,
> rather, to whether the actions of the court and the
> effect that they had on the conduct of the trial
> deprived the defendant -- whether otherwise innocent or
> guilty -- of the protections conferred by the Sixth
> Amendment.

*Id.* at 42.  The court noted that,

> [t]he Supreme Court has described the values furthered
> by the public trial guarantee as four: 1) to ensure a
> fair trial; 2) to remind the prosecutor and judge of
> their responsibility to the accused and the importance
> of their functions; 3) to encourage witnesses to come
> forward; and 4) to discourage perjury.

*Id.* at 43 (citing *Waller*, 467 U.S. at 46-47).

The court found that none of those values were seriously
implicated by the closure that occurred.  In conclusion, and
expressing its very narrow but oft-cited holding, the court said
"[w]e only hold that in the context of this case, where the
closure was 1) extremely short, 2) followed by a helpful
summation, and 3) entirely inadvertent, the defendant's Sixth
Amendment rights were not breached." *Id.*

The Tenth Circuit reviewed a case in which, consistent with
regular practice, the courthouse was locked after normal working
hours at 4:30 p.m. *United States v. Al-Smadi*, 15 F.3d 153, 154
(10th Cir. 1994).  As a result, defense counsel's wife and child
were unable to gain access to the courtroom. *Id.*  At 4:50 p.m.,

the trial adjourned. *Id.*

The Tenth Circuit reasoned that,

[t]he denial of a defendant's Sixth Amendment right to
a public trial requires some affirmative act by the
trial court meant to exclude persons from the
courtroom. . . . The brief and inadvertent closing of
the courthouse and hence the courtroom, unnoticed  by
any of the trial participants, did not violate the
Sixth Amendment.

*United States v. Al-Smadi*, 15 F.3d 153, 154-155 (10th Cir. 1994)

(citing *People v. Peterson*, 611 N.E.2d 284, 285 (N.Y. 1993);

*People v. Colon*, 521 N.E.2d 1075, 1078 (N.Y. 1988)).

Another inadvertent closure occurred in *Snyder v. Coiner*,

510 F.2d 224 (4th Cir. 1975).  In that case,

[t]he record shows that during the summations of
counsel, access to the courtroom was limited. This
limitation was apparently brought about by the
misunderstanding, by a deputy sheriff, of a request by
the court that a deputy be posted at the door of the
courtroom in order to keep any noise or disturbance at
a minimum. The deputy thought that he was to keep
people from going in or out of the courtroom during
final arguments. As a result of this misunderstanding,
the deputy denied access to members of the press and
possibly others. It is not clear from the record
whether or not any spectators were in the courtroom
during the summations.

365 F. Supp. 321, 323 (N.D. W. Va. 1973), *aff'd* 510 F.2d 224.

The Fourth Circuit found that the,

condition existed for but a short time and was quickly
changed by the Court, when advised of the action of the
bailiff. The bailiff, in acting as he did, merely

sought to prevent any disturbance during the arguments.
There were no restrictions placed on the defendant, his
counsel, family or witnesses or even spectators then in
the courtroom. The incident was entirely too trivial to
amount to a constitutional deprivation.

510 F.2d at 230.

However, inadvertence, does not preclude the occasioning of

a Sixth Amendment violation. In *Owens v. United States*, 483 F.3d

48, 54 (1st Cir. 2007), prior to jury selection, the Court had a

colloquy with a U.S. Marshal about courtroom seating during jury

selection:

Court: We're going to get 72 jurors in here. That will
mean we'll have a number of jurors. Now, let me ask
the marshals. It looks like we're going to need all
the rows except for this first row [where the
defendants were seated]. Is that going to be
sufficient for you?
Marshal: I think so, your Honor. I spoke to [the
courtroom deputy] about it, and I was going, I'll have
the officers and myself and the other fellows with me
stand off to the right, make sure all the jurors get
seated and have whatever spectators leave until there's
a sufficient amount of room.
Court: We'll need every seat with 72 people. All
right.

There was no objection offered at that time. *Owens*, 483 F.3d at

54. The marshals then cleared the courtroom and only allowed

prospective jurors entry. *Id.* As the jury selection process

progressed and jurors were dismissed, courtroom seating became

available. *Id.* Despite such openings, the defendant's family

claimed that the marshals continued to bar them from the courtroom for the entirety of jury selection which spanned one full day. *Id.* Subsequently, Owens challenged this closure of the courtroom as violative of his Sixth Amendment right to a public trial.

The government countered that any closure was trivial and inadvertent. *Id.* at 62. The Court in *Owens* found that the exclusion was not trivial, in that the courtroom "was allegedly closed to the public for an entire day while jury selection proceeded." *Id.* at 63. It further highlighted that "[j]ury selection is, of course, a crucial part of any criminal case." *Id.* at 63. The Court also did not find dispositive the judge's passive role in the continued closure, noting "even if the courtroom was closed because of inattention by the judge, courts have expressed concern in the past where a court officer's unauthorized closure of a courtroom impeded public access." *Id.* (citations omitted). The Court therefore noted that "if the trial court barred spectators from the courtroom, as Owens alleges, he was denied his Sixth Amendment right to have a public trial." *Id.* at 63.

To the extent the alleged closure extended beyond jury attendance and included a portion of *voir dire*, that occurrence

was similar to the closures found trivial in *Al-Smadi* and

*Petersen*. Notwithstanding the First Circuit's discussion of the

issues related to closure during *voir dire* in *Owens*, the events

that occurred here did not attempt to cloak the jury selection

process in secrecy. Significantly, this case can be distinguished

from *Owens* on the grounds that Fredericks' testimony supports an

inference that the public was permitted to witness jury

selection. The Court does not find that any exclusion that

occurred rose to a level where the defendants' Sixth Amendment

rights were violated.

Finally, the government argues that the defendants forfeited

their right to a public trial by failing to object to a violation

of that right at trial.  A defendant's Sixth Amendment right to a

public trial is subject to waiver. *See, e.g.*, *Singer v. United

States*, 380 U.S. 24, 35 ("[A] defendant can, under some

circumstances waive his constitutional right to a public trial .

. . ."); *United States v. Sorrentino*, 175 F.2d 721, 723 (3d Cir.

1949)(noting that consistent with the principle that a defendant

should have the right to determine that his interests may be best

aided by not exercising a right, such as the right to a trial by

jury, "[w]e think that the same considerations apply to the right

to a public trial and that a defendant may waive that privilege

also."); *Johnson v. Sherry*, 586 F.3d 439, 444 (6th Cir.

2009)(noting that a right to a public trial "can be waived when a

defendant fails to object to the closure of the courtroom,

assuming the justification for the closure is sufficient to

overcome the public and media's first amendment right to an open

and public trial proceeding."); *Crawford v. Minnesota,* 498 F.3d

851, 854 (8th Cir. 2007)(observing that though the right to a

public trial is a structural right, it may be waived)(internal

citation omitted). The government's argument is flawed in several

respects. Generally "the control of the conduct of [an accused's]

defense [is] confided in [counsel] and they [are] authorized to

speak for him in matters such as this." *Sorrentino*, 175 F.2d at

723.  However, such authority rests with an attorney with the

understanding that there will be a dialogue between client and

attorney about the client's rights.  Absent such sharing of

information, a defendant cannot necessarily be prejudiced by

counsel's malfeasance.  Of course, the Court need not reach the

issue of forfeiture in light of its finding that the defendants

have failed to establish a violative closure.

The government's forfeiture argument, however, did bring to

light a most troubling occurrence which the Court feels obligated

to address.  At the evidentiary hearing, Fredericks' testimony

suggested that an officer of the court may have been aware of

claims of exclusion and deliberately chose to sit on this

information.  Fredericks recounted a conversation he had with

Assistant Federal Public Defender, Jesse A. Gessin, outside the

courtroom in St. Thomas after Fredericks' alleged exclusion:

> MR. LINDQUIST: So Gessin told you -- Attorney Gessin told
> you to come to the Public Defender's Office to sign this
> affidavit.
>
> A: He told me -- this is exactly what he told me. He
> told me, You guys got put out again -- I mean, "you
> guys was outside again?"
>      And I say "Yeah"-- I told him, "Yeah," you know
> what I mean?
>
> MR. LINDQUIST: All right. So --
>
> A: And then he say, "There's a law against that."
>
>                      . . .
> THE COURT: . . . When you had your discussion with Mr.
> Gessin, which trial was it that you had that
> discussion?
>
> THE WITNESS: The third one.
>
>                      . . .
>
> THE COURT: All right. Now you said that Mr. Gessin had
> a paper. And what was that paper?
>
> THE WITNESS: No. He say it have a paper with a Supreme
> Court ruling, and he'll have to go and thing it up so I
> could read it; that something had happened similar to
> what happening to me now.

(Hr'g Tr. 131-32, 140, May 12, 2010.)  Though the Court makes no

assessment about whether Attorney Gessin's knowledge and failure

to object could have effectuated any waiver by the Office of the

Federal Public Defender's client, Greene, the Court does not find

the conduct detailed in Frederick's testimony to be that

befitting a member of the Virgin Islands Bar[11].  If an officer of

the Court perceives what she believes to be a closure, an

appropriate response would be to inform the Court of a possible

denial of access to the courtroom.  Allowing trial to progress

and an exclusion to continue in hopes of later profiting from

that infringement seems to run the unwise risk of neglecting to

safeguard a client's rights at trial in favor of "rais[ing] an

abstract claim . . . as an afterthought on appeal." *Levine v.

United States,* 362 U.S. 610, 620 (1960).


## IV. CONCLUSION

For the reasons given above, the Court will deny the

defendants' motions for a new trial.  An appropriate Order

accompanies this memorandum opinion.


S\_____
**CURTIS V. GÓMEZ**
**Chief Judge**

---

[11]In connection with the Court addressing the defendants' public trial motions, the Court ordered the Office of the Federal Public Defender to file a briefing about Attorney Gessin's conversation with Fredericks and when the Office became aware of the alleged exclusion. The Court notes that Attorney Gessin's response was evasive and singularly unhelpful to the Court's inquiry.