# DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

UNITED STATES OF AMERICA, and THE )
PEOPLE OF THE VIRGIN ISLANDS )
                                          )
                                          )
        Plaintiffs, )
                                          )
                                          )    Criminal No. 2009-32
        v. )
                                          )
                                          )
ENRIQUE SALDANA, GEORGE GREENE, )
JR., and LOUIS ROLDAN, )
                                          )
        Defendants. )
_____ )

ATTORNEYS:

Kim R. Lindquist, AUSA
Nolan D. Paige, AUSA
St. Thomas, U.S.V.I.
    *For the plaintiffs.*

Darren John-Baptiste, Esq.
Joseph A. DiRuzzo, III, Esq.
St. Thomas, U.S.V.I.
    *For the defendant Enrique Saldana.*

Thurston T. McKelvin, FPD
Gabriel Villegas, AFPD
St. Thomas, U.S.V.I.
    *For the defendant George Greene.*

George H. Hodge, Jr., Esq.
St. Thomas, U.S.V.I.
    *For the defendant Louis Roldan.*

## MEMORANDUM OPINION

GÓMEZ, C.J.

    Before the Court is the motion of defendant Enrique Saldana

("Saldana") for a judgment of acquittal, a new trial, or an arrest of judgment pursuant to Rules 29, 33, and 34 of the Federal Rules of Criminal Procedure.

## I. **FACTS**[1]

On December 4, 2008, the Virgin Islands Police Department ("VIPD") seized a rental car that Richard Motta ("Motta") was driving. After conducting a search of the car, law enforcement officers discovered a package containing one kilogram of what was believed to be a controlled substance. In fact, the substance was flour, packaged to look like cocaine.

The rental car had been rented by Rosemary Sauter ("Sauter"). Motta worked for Ramon Ayala ("Ayala") as a subcontractor. Ayala was employed by Sauter.

In addition to the substance appearing to be cocaine, the rental car contained several items, including sunglasses, keys, and a notepad. At some point, that substance was tested. The test indicated that the substance was not cocaine.

Sauter and Motta went to the police station to inquire about the seized rental car. Motta was told to contact Saldana about the return of the items in the car. Before Motta did that, Saldana called Motta, and said he was going to meet Motta.

---

[1] This description of the facts is based on evidence adduced at trial.

The next day, Motta went back to the police station in search of Saldana, but did not find him. Saldana called Motta again later that day. Motta told Saldana to leave the items at the police headquarters front desk, but when he went to look for the items, nothing had been left for him.

Shortly thereafter, Roldan approached Motta. Roldan said to Motta, "[h]ey, you just the man I looking for." Motta did not know Roldan before that encounter. Motta had not spoken to Roldan about the seized car, the kilo of fake cocaine, or his desire to avoid having the substance turned over to law enforcement. Nonetheless, Roldan knew all about the car and the kilo of fake drugs.

Roldan told Motta that the police had tested the substance for cocaine, and that it tested negative. He also said that they had tested it for heroin, and that it had tested positive. Roldan told Motta that if he did not come up with $10,000, the police were going to turn the substance over to federal authorities. Motta testified that he exchanged phone numbers with Roldan, and told Roldan that he would get back to him.

Motta relayed these events to Sauter. Sauter, in turn, convinced Motta to speak to the FBI. Motta agreed to work with the FBI. The FBI had Motta make a number of telephone calls,

which were recorded and were introduced at the retrial.

In one of those recorded conversations between Roldan and Motta, Roldan referred to a police officer that was holding the substance. In another conversation between the two men, Roldan refers to other individuals involved in the deal, a helper and a boss. Motta testified that in that same call, when Roldan referred to "mechanics," he was making a coded reference to police officers. Roldan said that one mechanic – or policeman – was willing to accept less than the $10,000 originally requested, and that Motta would have to deal with that "mechanic." He also said that there were two "mechanics," and that the other one – not the one willing to accept a smaller payment – was holding the substance.

In yet another call between Roldan and Motta, in which the men attempted to work out the extortion details, Roldan said Motta would have to deal with "the mechanic that you talked to." Motta understood Roldan to be referring to the only law enforcement officer he had spoken to about the seizure, Saldana.

In a later conversation, Motta began speaking with Roldan, then Greene came on the line. In the same conversation, Roldan told Motta that the "two of them" who were coming to meet Motta were the ones in control of the extortion transaction. Motta

understood Roldan to be referring to the two police officers who were in possession of the substance. In that conversation, Motta and Roldan agreed they should meet at the Hometown gas station on St. Thomas.

On December 23, 2008, Greene, Roldan and Motta met at Hometown to further discuss the details of the extortion payment. Motta pulled up next to Roldan's vehicle and spoke to him through the window. Then Motta saw two police vehicles pull through the gas station and continue on toward a basketball court nearby. Roldan told him that the police wanted to meet near the basketball court. Motta followed Roldan's vehicle and the police vehicles to a pull-off near the basketball court.

When he parked near the basketball court, Motta saw Saldana sitting in his police vehicle. Motta said that he walked by Saldana's vehicle. As he passed the vehicle, Saldana rolled up the window.

Motta continued on, and spoke with only Greene and Roldan. Saldana never joined the group while Motta was present. Motta agreed with Greene and Roldan to meet the men in an area of St. Thomas known as Frenchtown, at 8:00 p.m. that evening, to make the extortion payment.

Once Motta left the area, law enforcement officers

surveilling the scene saw Greene and Roldan go to Saldana's vehicle and speak with him.

Later that same evening, Motta met with Roldan and Greene in Frenchtown.  The FBI had fitted Motta with a camera that recorded the meeting.  That night, on camera, Motta removed $5,000 in cash from his pocket, and asked if Greene wanted to count it.  Greene said he did not, and told Motta to put it in Greene's police vehicle.  Motta put the $5000 in the back seat of Greene's VIPD vehicle.  A phone toll log the government introduced showed that Greene called Saldana just after he received the payment.

Based on those events, a grand jury returned an indictment charging the defendants with, among other things, conspiracy to commit extortion, extortion, conflict of interest and solicitation and receipt of a bribe, and extortion under color of official right.  The trial of this matter commenced on December 14, 2009.  At the conclusion of the defendants' trial, the jury was unable to reach a unanimous verdict.  That trial ended in a mistrial.

A retrial of the matter commenced on January 25, 2010. After a five-day retrial at which evidence of the foregoing events was presented, Greene was acquitted of making a false statement and money laundering.  The jury convicted the

defendants on the remaining counts.

## II. <u>DISCUSSION</u>

## A. Rule 29

A defendant "challenging the sufficiency of the evidence bears a heavy burden." *United States v. Casper*, 956 F.2d 416, 421 (3d Cir. 1992). A judgment of acquittal is appropriate under Rule 29 only if, after reviewing the record in a light most favorable to the prosecution, the Court determines that no rational jury could find proof of guilt beyond a reasonable doubt. *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006); *see also United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (district court must "'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.'" (quoting *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)).

An insufficiency finding should be "'confined to cases where the prosecution's failure is clear.'" *Smith*, 294 F.3d at 477 (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)). "Courts must be ever vigilant in the context of [Rule] 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment

for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133

(3d Cir. 2005) (citations omitted); *see also United States v.*

*Ashfield*, 735 F.2d 101, 106 (3d Cir. 1984) ("Our task is not to

decide what we would conclude had we been the finders of fact;

instead, we are limited to determining whether the conclusion

chosen by the factfinders was permissible.").

Further, the government may sustain its burden entirely

through circumstantial evidence. *Bobb*, 471 F.3d at 494; *see also*

*United States v. Wexler*, 838 F.2d 88, 90 (3d Cir. 1988).

**B. Rule 33**

When deciding a Rule 33 motion for a new trial, the Court is

provided somewhat more discretion than what is afforded under

Rule 29.  Under Rule 33, the Court may grant a new trial "in the

interest of justice." *United States v. Charles*, 949 F. Supp. 365,

368, 35 V.I. 306 (D.V.I. 1996).  In assessing such "interest",

the court may weigh the evidence and credibility of witnesses.

*United States v. Bevans*, 728 F. Supp. 340, 343 (E.D. Pa. 1990),

*aff'd*, 914 F.2d 244 (3d Cir. 1990).  If the Court determines that

there has been a miscarriage of justice, the court may order a

new trial. *Id*.  "The burden is on the defendant to show that a

new trial ought to be granted. Any error of sufficient magnitude

to require reversal on appeal is an adequate ground for granting

a new trial." *United States v. Clovis*, Crim. No. 94-11, 1996 U.S.

Dist. LEXIS 20808, at *5 (D.V.I. Feb. 12, 1996).

**C.  Rule 34**

Rule 34 permits a court to arrest judgment if the indictment

or information does not charge an offense, or if the court does

not have jurisdiction of the charged offense.

In deciding a Rule 34 motion based on the indictment, "[a]

court may not look beyond the face of the 'record' which consists

of 'no more than the indictment, the plea, the verdict . . . when

the plea is "not guilty" . . . and the sentence . . . .'" *United*

*States v. De Miranda*, No. 2008-20, 2008 U.S. Dist. LEXIS 104621,

at *3 (D.V.I. Dec. 29, 2008) (quoting *United States v. Stolon*,

555 F. Supp. 238, 239 (E.D.N.Y. 1983)); *see also United States v.*

*Diaz*, No. 92-78, 1993 U.S. Dist. LEXIS 3569, at *5 (E.D. Pa. Mar.

25, 1993) ("A Rule 34 motion must be based solely on a defect

apparent on the face of the indictment itself, and not on the

sufficiency of the evidence adduced at trial.") (citing *United*

*States v. Sisson*, 399 U.S. 267, 280-81 (1970)).

## III. <u>ANALYSIS</u>

**A. Rule 29**

Saldana claims there was insufficient evidence to convict

him.

**1. Counts 5 and 6**

Saldana argues there was not sufficient evidence to convict him of counts 5 and 6, conspiracy to commit extortion and extortion.

In order to sustain its burden of proof for conspiracy to commit extortion, the government had to show that (1) two or more persons agreed to commit extortion, (2) Saldana was a party to or member of that agreement or conspiracy, and (3) Saldana joined the agreement or conspiracy knowing of its objective to commit extortion and intending to join together with at least one other co-conspirator to achieve that objective. *See United States v. Inigo*, 925 F.2d 641, 652 (3d Cir. 1991) (citation omitted); *see also* 18 U.S.C. § 1951(a).

In order to gain a conviction on count 6, extortion, the government had to show the following elements: (1) Saldana took money or property, (2) he did so knowingly and willfully by extortion, and (3) as a result of Saldana's actions, interstate commerce was obstructed or delayed. *See United States v. Driggs*, 823 F.2d 52, 54 (3d Cir. 1987); *see also* 18 U.S.C. § 1951(a).

The elements of a conspiracy may be proven entirely by circumstantial evidence, and inferences from established facts may suffice to prove a conspiracy when no direct evidence is

available. *See Bobb*, 471 F.3d at 494 (3d Cir. 2006) (citing

*United States v. Wexler*, 838 F.2d 88, 90 (3d Cir. 1988)); *United*

*States v. Idowu*, 157 F.3d 265, 269 (3d Cir. 1998). However,

there must be "a logical and convincing connection between the

facts established and the conclusion inferred." *Idowu*, 157 F.3d

at 269.

The essence of any conspiracy is the agreement. *United*

*States v. Pressler*, 256 F.3d 144, 147 (3d Cir. 2001). Since

agreements to commit crimes are clandestine by nature, direct

evidence of conspiracies is rare. *See id.*

Saldana was the first to make contact with Motta. Shortly

after that, a private citizen with no law enforcement credentials

was fully aware of the seizure of the rental car containing a

kilogram of what appeared to be cocaine. That citizen, Roldan,

demanded a payment from Motta to avoid alerting federal law

enforcement. Greene was subsequently involved in arranging for

the payment and assuring Motta that nothing would happen after

payment, saying "[e]verything straight, daddy." That statement

meant, according to Motta, that nothing about the package would

come back to haunt him.

While Saldana had little direct contact with Motta, that

circumstance does not preclude a finding that he was involved in

extortion.  Here, it was entirely permissible for the jury to infer, from the circumstantial evidence, that he was the architect that pieced together the players and the plan.

Following Saldana's initial contact with Motta, Roldan, then Greene came on the scene, fully aware of Motta's precarious circumstances.  That sequence of events supported the jury's finding of a conspiracy because it was "'evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding.'" *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986) (quoting *United States v. Ellis*, 595 F.2d 154, 160 (3d Cir. 1979)).  Similarly, a jury could make a reasonable and logical inference that Saldana had procured the involvement of Greene and Roldan, and had informed them about Motta and the substance.  Without Saldana's involvement, Greene and Roldan would not have known about Motta or the substance. *Cf. United States v. Gambino,* 788 F.2d 938, 946 (3d Cir. 1986) ("That the determination of the weight of the evidence and inferences to be drawn . . . is exclusively within the province of the jury is a vital linchpin of our criminal justice system .")

> The line between a reasonable inference that may
> permissibly be drawn by a jury from basic facts in
> evidence and an impermissible speculation is not drawn
> by judicial idiosyncracies. The line is drawn by the
> laws of logic. If there is an experience of logical
> probability that an ultimate fact will follow a stated
> narrative or historical fact, then the jury is given
> the opportunity to draw a conclusion because there is a
> reasonable probability that the conclusion flows from
> the proven facts. As the Supreme Court has stated, "the
> essential requirement is that mere speculation be not
> allowed to do duty for probative facts after making due
> allowance for all reasonably possible inferences
> favoring the party whose case is attacked."

*Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 895 (3d Cir.

Pa. 1981) (quoting *Galloway v. United States*, 319 U.S. 372, 395

(1943)). Given Roldan and Greene's knowledge of the

circumstances, it was reasonably probable that Saldana had

informed them of the situation, and sent them to deal with Motta.

Moreover, a finding of extorting money from a drug dealer –

even one who deals in counterfeit drugs – was sufficient for the

jury to find that Saldana's actions could have potentially

affected interstate commerce. *See United States v. Marrero*, 299

F.3d 653 (7th Cir. 2002) (affirming conviction of robbery in

violation of Hobbs Act where defendants had lured drug dealers

with a quantity of fake cocaine, then robbed them, affecting

interstate commerce); *United States v. Pledge*, 51 Fed. Appx. 911

(4th Cir. 2002) (affirming Hobbs Act robbery conviction of police

officer who took money, drugs, and weapons from drug dealers in

exchange for not arresting them).

One can reason that a quantity of fake cocaine was removed from commerce, and as a result some potential cocaine buyer bought other cocaine instead of spending his money on Motta's fake narcotics.

Based on the foregoing, the Court finds that a rational jury believing the government's evidence could have found that Saldana was a knowing and intentional member of the conspiracy to extort money from Motta, and that Saldana aided and abetted Greene and Roldan in extorting a payment from Motta. Accordingly, the Court will deny Saldana's motion for judgment of acquittal with respect to counts 5 and 6.

**2. Counts 7, 8, 9, and 10.**

Counts 7 through 10 charged Saldana with violations of Virgin Islands law. Count 7 charged Saldana with conspiratorial extortion, conflict of interest, and solicitation and receipt of a bribe. Count 8 charged him with extortion under color of official right. Count 9 charged conflict of interest. Count 10 charged solicitation and receipt of a bribe. Saldana was also charged with aiding and abetting each of these counts.

In order to prove Saldana aided and abetted each of the crimes charged, the government had to produce evidence that (1)

Saldana knew that the crime charged was to be committed, (2) he

knowingly did some act for the purpose of furthering the

commission of that crime, (3) he acted with the intention of

causing the crime charged to be committed, and (4) someone

committed each of the elements of the crime charged. *See* V.I.

CODE ANN. tit. 14, § 11(a); *see also Simon v. Gov't of the V.I.*,

No. 2003-24, 2009 U.S. Dist. LEXIS 79644, at *18 (D.V.I. App.

Div. Aug. 6, 2009).

### a. Count 7

In order to convict Saldana on count 7, the government had

to show that (1) two or more persons agreed to commit a crime,

(2) Saldana was a party to or member of that agreement, (3)

Saldana joined the agreement or conspiracy knowing of its

objective to commit a crime and intending to join together with

at least one other person to achieve that objective, and (4) at

some time during the existence of the agreement or conspiracy, at

least one of its members performed an overt act in order to

further the objective of the agreement. *See Francis v. People of

the V.I.*, No. 2007-093, 2009 V.I. Supreme LEXIS 44, at *11 (V.I.

2009); *See also Bigby v. Gov't of the V.I.*, 125 F. Supp. 2d 709,

712 (D.V.I. App. Div. 2000); V.I. CODE ANN. tit. 14, §§ 551, 552.

The elements the government had to prove to convict Saldana

of count 7 substantially overlap with the elements for count 5.

As noted, there was sufficient evidence for the jury to find

Saldana guilty of count 5.  Count 7, however, also required proof

of the additional element that one of the members of the

conspiracy commit an overt act.

   With regard to the overt act, there was abundant evidence of

acts done in furtherance of the conspiracy.  For example, the

government's video showed Greene accepting a bag of cash from

Motta.  Also, Motta testified that Roldan approached Motta on the

waterfront to inform him that the substance had tested positive

for heroine and that he needed to make an extortion payment.

Further, as noted, there was powerful circumstantial evidence

that Saldana had directed Roldan to approach Motta and make the

extortion demand.  These were all overt acts in furtherance of

the conspiracy.

   The Court finds that a rational jury, believing the

governments evidence, could have found beyond a reasonable doubt

that Saldana was guilty of count 7, conspiratorial extortion.

### b. Count 8

   In order to prove extortion under color of official right,

the government had to produce evidence that (1) a defendant took

property from an individual, (2) he did so knowingly and

willfully by extortion, (3) he did so under color of official

right, and (4) that Saldana aided and abetted others in extortion

under color of official right. *See* V.I. CODE ANN. tit. 14, §§ 701,

11; *see also Gov't of the V.I. v. Berry*, 604 F.2d 221, 227 n. 15

(1979), *superseded by statute on other grounds*, V.I. CODE ANN.

tit. 14, § 1052(b), *as recognized in Martinez v. Gov't of the

V.I.,* No. 2004-148, 2008 U.S. Dist. LEXIS 107613, at *7 (D.V.I.

App. Div. 2008).

As noted, the government presented sufficient evidence that

Saldana committed extortion.  Further, there was proof that

Saldana and Greene acted under color of official right.  Under

federal law, in order to prove extortion under color of official

right "the Government need only show that a public official has

obtained a payment to which he was not entitled, knowing that the

payment was made in return for official acts." *Evans v. United

States*, 504 U.S. 255, 268 (1992).

As noted, there was a permissible inference to be made that

Roldan was directed by Saldana and was in league with Greene.

Motta testified that Roldan threatened that the VIPD would turn

the substance over to federal law enforcement if Motta did not

make an extortion payment.  Accordingly, a rational jury could

have found that the extortion was under color of official right.

A rational jury, believing the government's evidence, could have

found Saldana guilty of aiding and abetting extortion under color

of official right, count 8, because he procured the commission of

the crime by others. *See* V.I. CODE ANN. tit. 14, § 11(a) ("Whoever

commits a crime or offense or aids, abets, counsels, commands,

induces or procures its commission, is punishable as a

principal.").

### c. Count 9

In order to prove count 9, conflict of interest, the

government was required to prove that (1) a defendant knowingly

had an interest in a transaction, (2) that the transaction was in

substantial conflict with the discharge of his official duties

and his responsibilities as prescribed in the laws of the Virgin

Islands, and (4) that Saldana aided and abetted someone in having

a conflict of interest. *See* V.I. CODE ANN. tit. 3, § 1102(3); V.I.

CODE ANN. tit. 14, § 11.

Greene's receipt of $5,000, in exchange for not turning the

substance over to federal law enforcement, showed that Greene

knowingly had a financial interest in the transaction.

Moreover, receiving the extortion payment was in conflict

with the duties of a VIPD officer.  VIPD officers have a duty to

apprehend anyone who engages in counterfeit drug trafficking,

such as Motta. *See* V.I. CODE ANN. tit. 19, § 604(a)(2) (making

unlawful the knowing or intentional creation, distribution, or

possession with intent to distribute a counterfeit controlled

substance); V.I. CODE ANN. tit. 3, § 257(a) (giving the VIPD the

power to enforce Virgin Islands laws relating to public safety).

Instead of arresting Motta, the defendants extorted a payment

from him so the substance would disappear.

Accordingly, the Court finds that a rational juror,

believing the government's evidence, could have found Saldana

guilty of count 9, aiding and abetting a conflict of interest.

### d. Count 10

To meet its burden of proof with respect to count 10,

solicitation and receipt of a bribe, the government had to adduce

evidence that (1) a defendant was a public official, (2) he asked

for or received any emolument, gratuity, or reward, or any

promise thereof that was not provided by law, (3) he did so for

an official act, and (4) that Saldana aided and abetted the

receipt of that bribe. *see* V.I. CODE ANN. tit. 14, §§ 403, 11.

Both Saldana and Greene testified to being VIPD officers.

Moreover, Roldan told Motta that the substance would be turned

over to federal officials who may have sought to prosecute Motta,

unless Motta made an extortion payment. A police officer's

decision to forego arresting a criminal in exchange for a payment is considered an official act under the federal analogue, 18 U.S.C. § 1951. *See United States v. Ferby*, Nos. 02-1506, 02-1535, 2004 U.S. App. LEXIS 28789, at *10-11 (2d Cir. Sept. 23, 2004) (unpublished) (finding sufficient evidence existed for attempted extortion under color of official right where officer accepted money in exchange for a suspect's physical liberty and took payments from another suspect in exchange for police information that would help him avoid arrest). While "official act" is not defined in the Virgin Islands Code or in the territory's case law, the rationale in the federal case law is persuasive. *See, e.g.*, *United States v. Hamilton*, 263 F.3d 645, 653 (6th Cir. 2001) (upholding Hobbs act extortion where police officer asked another officer to reduce charges against a suspect, and in exchange the suspect sold the police officer a deeply discounted computer). As such, the Court finds that a police officer's decision not to pursue arrest for, and prosecution of, a crime constitutes an official act under Virgin Islands law.

Accordingly, the Court will deny Saldana's rule 29 motion with regard to count 10, solicitation and receipt of a bribe under Virgin Islands law.

**B. Rule 33**

Saldana is required to show there is newly discovered evidence, or that there was reversible error at his trial, in order to be granted a new trial pursuant to Federal Rule of Criminal Procedure 33. "[A] district court 'can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred — that is, that an innocent person has been convicted.'" *United States v. Davis*, 397 F.3d 173, 181 (3d Cir. 2005) (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)). Further, the "burden is on the defendant to show that a new trial ought to be granted." *Clovis*, 1996 U.S. Dist. LEXIS 20808, at *5.

Accordingly, the burden is on Saldana to show that his trial resulted in a miscarriage of justice.

Saldana argues that there are five bases for a new trial.[2] The Court will address each in turn.

**1. Cross Examination**

Saldana argues that the Court limited his cross examination of the government's key witness, Motta. Saldana argues that this

---

[2] Saldana also claims he is entitled to a new trial based on a violation of his Sixth Amendment right to a public trial. The Court addresses that argument in a separate opinion.

limitation infringed on his Sixth Amendment confrontation right.

During Motta's cross examination, defense counsel asked Motta about his whereabouts on January 15, 2009. Following a government objection, the court admonished counsel to "ask a relevant question." (Jan 26, 2010 Tr. 346 .) Defense counsel ceased examination of the witness at that time.

Saldana now argues that he was trying to elicit from Motta the fact that he had been incarcerated on St. Croix during the period in question on a highly publicized robbery charge. Saldana argues that his attorney was trying to ascertain whether Motta had knowledge of the federal government playing a part in getting the robbery charges dismissed. However Saldana did not object at the time that the Court admonished counsel to ask a relevant question.

> Indeed, [t]he main and essential purpose of
> confrontation is to secure for the opponent the
> opportunity of cross-examination. . . . Of particular
> relevance here, [w]e have recognized that the exposure
> of a witness' motivation in testifying is a proper and
> important function of the constitutionally protected
> right of cross-examination. It does not follow, of
> course, that the Confrontation Clause of the Sixth
> Amendment prevents a trial judge from imposing any
> limits on defense counsel's inquiry into the potential
> bias of a prosecution witness. On the contrary, trial
> judges retain wide latitude insofar as the
> Confrontation Clause is concerned to impose reasonable
> limits on such cross-examination based on concerns
> about, among other things, harassment, prejudice,
> confusion of the issues, the witness' safety, or

> interrogation that is repetitive or only marginally
> relevant.

*United States v. Chandler*, 326 F.3d 210, 218-219 (3d Cir. 2003)

(internal citations and quotation marks omitted).

In assessing whether the right to confront a witness has

been abridged by the Court, the Court must inquire if the ruling

significantly inhibited the defendant's effective exercise of his

right to inquire into the witness' motivation in testifying.  If

there was significant inhibition, the Court must examine whether

the constraints imposed on the scope of cross examination fell

within those "reasonable limits" which a trial court, in the

exercise of its discretion, has the authority to establish. *Id*.

at 219.

In *Chandler*, the trial court prohibited defense counsel from

asking government witnesses about the potential sentencing

exposure they were avoiding in exchange for testifying, as part

of plea agreements. *Id*. at 217-19.

In contrast, in this case, the Court did no more than remind

defense counsel to ask only relevant questions.  The Court did

not stop the cross examination.  It was defense counsel's choice

to terminate the cross examination upon that reminder.  Moreover,

the Court's reminder was intended to remind counsel of Rule 403

and steer the inquiry away from potentially confusing and
misleading testimony regarding the robbery.  As such, the Court
did not significantly inhibit Saldana's ability to cross examine
Motta about his possible motivation for testifying.

## 2. Jury Instructions

Saldana further argues that the Court erred in refusing to
give a jury instruction on his public authority defense, a good
faith defense, and a curative instruction regarding the Court's
comment in overruling an objection.

A trial court's decision to give a particular jury
instruction is within the judge's discretion. *United States v.
Leahy*, 445 F.3d 634, 642 (3d Cir. 2006) ("'We review the refusal
to give a particular instruction or the wording of instructions
for abuse of discretion.'" (quoting *United States v. Coyle*, 63
F.3d 1239, 1245 (3d Cir. 1995)).

> A defendant is entitled to an instruction on his theory
> of the case where the record contains evidentiary
> support for it. . . . A court errs in refusing a
> requested instruction only if the omitted instruction
> is correct, is not substantially covered by other
> instructions, and is so important that its omission
> prejudiced the defendant.

*United States v. Davis*, 183 F.3d 231, 250 (3d Cir. 1999) (citing
*Gov't of V.I. v. Carmona*, 422 F.2d 95, 99 n.6 (3d Cir. 1970);
*United States v. Smith*, 789 F.2d 196 (3d Cir. 1986)).

### a. Public authority

Saldana argues that he should get a new trial because this Court refused to give a public authority instruction.  "The defense of 'public authority' is based in commonlaw [sic]. Under the defense, illegal actions committed by a public official or an officer of the law in the course of his duties were not crimes." *United States v. Pitt*, 193 F.3d 751, 756 (3d Cir. 1999).

Public authority is an affirmative defense.  Crucially, as described in *Pitt*, the defendant must admit to the illegal act. He is simply absolved of guilt based on his authority to commit the crime in the course of his duties.

Here, Saldana did not admit taking an extortion payment or doing any other illegal act.  As such, there was not evidentiary support for the public authority instruction.  It would not have been appropriate for the Court to give the instruction.

### b. Good faith defense

Saldana argues that good faith was a complete defense to the charges against him, and that the Court should have given the instruction on it that he requested.[3]  He points out that a jury

---

[3] The instruction Saldana requested is, in its entirety:

The "good faith" of the Defendant Enrique Saldana is a complete defense to the charges contained in the Indictment because good faith on the part of the defendant, is simply inconsistent with the specific intent required before the

finding of good faith undermines a finding of specific intent.

However, the information in the instruction that Saldana requested was substantially imparted to the jury in the mental state instruction that the Court did give:

> The crimes charged in this case are serious crimes, which require proof of the defendant's mental state or intent before a defendant can be convicted. To establish mental state or intent the government must prove that the defendant's actions were knowingly and intentionally done. The government is not required to prove that a particular defendant knew that he was breaking the law when he did the acts charged in the Indictment. You may determine their mental state or

---

Defendant can be convicted of the charges contained in the indictment.

    A person who acts, or who causes another person to act, on a belief or an opinion honestly held is not punishable under these statutes merely because the belief or opinion turns out to be inaccurate, incorrect, or wrong. An honest mistake in judgment or an honest error in management does not rise to the level of criminal conduct.

    The law is written to subject to criminal punishment only those people who specifically intend to violate that law.

    While the term "good faith" has no precise definition, it encompasses, among other things, a belief or opinion honestly held, an absence of malice or ill will, and an intention to avoid taking unfair advantage of another.

    In determining whether or not the government has proven that Defendant Enrique Saldana acted with a specific intent to commit the crimes charged in the indictment, or whether the defendant acted in good faith, the jury must consider all of the evidence received in the case bearing on the defendant's state of mind.

    The burden of proving good faith does not rest with the defendant because the defendant does not have any obligation to prove anything in this case. It is the government's burden to prove to you, beyond a reasonable doubt, that Defendant Enrique Saldana acted with the specific intent to commit the crimes charged in the Indictment.

    If the evidence in the case leaves the jury with a reasonable doubt as to whether the defendant acted with specific intent to commit the crimes charged, or if the Defendant instead acted in good faith, the jury must acquit Defendant Enrique Saldana.

intent from all the facts and circumstances surrounding
the case.

State of mind or knowledge ordinarily may only be
proved indirectly, that is, by circumstantial evidence,
because there is no way we can get inside to observe
the operations of the human mind. While witnesses may
be able to give direct evidence of what a defendant
said or did or failed to say or do, there can be no
eyewitness account of the state of a person's mind at
the time an act was done. But what a person says,
does, or fails to say or do, may indicate the state of
mind in which the person did the act.

Although you are not required to do so, you may
reasonably infer that a person ordinarily intends the
natural and probable consequences of his or her knowing
and conscious acts. As the judges of the facts, you
may draw the inference that a defendant knew and
intended all the consequences which someone in similar
circumstances, and having the same or similar
knowledge, should reasonably have expected to result
from his intentional act or conscious omission. You
can consider any such evidence in determining whether
the government has proved beyond a reasonable doubt
that a defendant possessed the required criminal intent
or state of mind.

Unless otherwise instructed, in determining the
issue of state of mind of a defendant, you can consider
any statements made and acts done by him, as well as
other facts, inferences, and circumstances in evidence
which indicate his state of mind or intent.

(Jury Charge.) Further, the Court gave instructions on the

elements of each crime with which Saldana was charged. Those

instructions also contained the *mens rea* required for each count.

Saldana's requested "good faith" instruction would have been

redundant considering the instructions given.

### 3. Court's comment

Saldana argues that the Court may have undermined the

defense case in ruling on an objection.

During Saldana's cross examination, there was an objection. In overruling the objection, the Court said "co-conspirators." The Court used the term co-conspirators as shorthand for counsels' benefit in order to inform them of, and in order for the record to reflect, the basis for the Court's evidentiary ruling.

Counsel for Roldan immediately objected. At a side bar, Roldan's counsel argued that the Court's comment required a curative instruction. Saldana alleges that the Court seemed to agree, but that the Court did not provide such an instruction.

In fact, a review of the transcript shows that when counsel requested an instruction regarding the Court's statement, the Court said, at side bar ". . . I think it will probably cause more harm by raising the flag at this point. . . . I'm not going to do that. Thank you." (Jan. 28, 2010 Tr. 292.)

The Court did say, in overruling objections to admissible co-conspirators' statements in furtherance of the conspiracy, pursuant to Rule 801, "[o]verruled. Coconspirator . . ." and "[o]kay. Coconspirator's." (Jan. 28, 2010 Tr. 290.)

The statements were made just twice, in quick succession, during the course of a week-long trial. It is true that the jury

could possibly have misunderstood the Court to be referring to

the defendants as coconspirators, rather than using shorthand

regarding a rule of evidence.   However, the Court finds that

result unlikely.   Moreover, the Court, in its discretion, decided

that a specific curative instruction would have drawn attention

to the Court's shorthand, and was more likely to confuse the jury

than was a decision to give no specific instruction at all.

Further, the Court specifically admonished the jury not to

consider the Court's rulings on objections in coming to

conclusions about the defendants' guilt or innocence.[4]   The Court

presumes that the Jury follows its instructions, and did not rely

on the Court's comment in finding Saldana guilty. *See United*

---

[4] The Court instructed the jury:

> During the course of this trial, you have seen counsel, both
> for the government and for the defendant, make various objections
> to questions asked and evidence offered.   It is not only the
> right, it is the duty, of counsel for either the government or for
> defendant to object when that counsel believes evidence or
> testimony being offered is not admissible under the rules of
> evidence.   Then I rule on the objection.
> Do not be influenced in any way by my rulings, whether in
> favor of the government or the defense.   As I have already told
> you, these rulings involved questions of law only, and may not be
> given any consideration by you in your deliberations. . . .
> If I have asked any questions to any of the witnesses during
> the course of this trial or if I have said or done anything during
> the trial, or in the course and manner of instructing you now,
> whereby it seems to you that I am inclined to favor the case of
> the government or the case of the defendant, you must remove any
> such impression from your minds and not be influenced by any such
> impression, because none was intended.

(Jury charge.)

*States v. Root*, 585 F.3d 145, 167 (3d Cir. 2009) ("juries are

presumed to follow the instructions they are given").

### 4. Newly Discovered Evidence, *Brady* Violation

Saldana notes that his public authority defense was premised

on the claim that he was investigating an alleged murder for

hire.  According to Saldana, the murder for hire involved

Rosemary Sauter.  Motta was working as a subcontractor for Ramon

Ayala, one of Sauter's employees.  Part of Saldana and Greene's

defense was that they were investigating the possibility that

Sauter had tried to hire someone to kill her husband.

Saldana alleges that following the instant trial, Sauter has

become the subject of a breach of fiduciary duty civil action

involving thousands of dollars she held in escrow, that she

cannot be located by law enforcement officials, and that her

office has been closed as a crime scene.

Saldana attempts to turn the subsequent events involving

Sauter into a *Brady* violation.  "[T]he suppression by the

prosecution of evidence favorable to an accused upon request

violates due process where the evidence is material either to

guilt or to punishment, irrespective of the good faith or bad

faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87

(1963).  The holding in *Brady* was extended to include impeachment

evidence. *Giglio v. United States*, 405 U.S. 150, 154 (1972); *see also United States v. Risha*, 445 F.3d 298 (3d Cir. 2006) ("Of course, a failure of the prosecution to disclose impeachment evidence, coupled with a duty to disclose, would result in a *Brady* violation."). However, *Brady* requires only the disclosure of material evidence, that is, evidence that could have affected the outcome of the trial. *United States v. Bagley*, 473 U.S. 667, 674 (1985) (citations omitted).

To prove a *Giglio* violation, the defendant must show that (1) the government withheld evidence, (2) the evidence was favorable, either because it was exculpatory or has impeachment value, and (3) the withheld evidence was material. *See Risha*, 445 F.3d at 303 (applying the three-part *Brady* test where impeachment evidence was withheld). Failure to show any of the three prongs is fatal to a *Brady* claim. *See United States v. Higgs*, 713 F.2d 39, 42 (3d Cir. 1983).

Further,

> Five requirements must be met before a district court may grant a new trial on the basis of newly discovered evidence:
> > (a) the evidence must be in fact, newly discovered, i.e., discovered since the trial;
> > (b) facts must be alleged from which the court may infer diligence on the part of the movant;
> > (c) the evidence relied on, must not be merely cumulative or impeaching;
> > (d) it must be material to the issues involved;

> and
> (e) it must be such, and of such nature, as that,
> on a new trial, the newly discovered evidence
> would probably produce an acquittal.

*United States v. Brown*, 595 F.3d 498, 511 (3d Cir. 2010) (citing

*United States. v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006)).

In this case, before trial, Saldana requested information

about prospective government witnesses who had engaged in

criminal activity. Saldana now requests a hearing to determine

if the government had any information about Sauter's wrongdoing

before his trial, which it withheld from him.

However, Saldana has not pointed to any evidence that the

government withheld from him, which critically undermines his

contention that there was a *Giglio* violation. *See, e.g.*, *United*

*States v. Serafini*, 233 F.3d 758, 768 (3d Cir. 2000) (Finding

defendant had failed show a *Giglio* violation because he had not

offered any evidence of immunity offered to a prosecution

witness).

The Court is aware of case law finding that the government's

failure to turn over previous contradictory witness statements,

*United States v. Edwards*, 264 Fed. Appx. 139, 142 (3d Cir. 2008)

(unpublished), witness' criminal background information, *United*

*States v. Perdomo*, 929 F.2d 967, 970 (3d Cir. 1991), or

information regarding government payments to witnesses, *United States v. Thornton*, 1 F.3d 149, 158 (3d Cir. 1993), can constitute *Giglio* violations. However, the Court is unaware of any case holding that the government must turn over information regarding impending civil litigation involving one of its witnesses, or even a criminal investigation into that witness, even if it is aware of that information. Further, the government has stated that it was not aware of any criminal investigation into Sauter at the time she testified at trial.

Moreover, Sauter's testimony did not add much to the government's case. The jury had no need to rely on her testimony to find any element for any of the charges against Saldana. Assuming *arguendo* that Saldana could show that the government withheld evidence he could have used to impeach her, Saldana has not articulated how even her complete impeachment would have resulted in an acquittal. As such, Saldana is not entitled to a new trial.

## 5. Evidentiary Rulings

Saldana also argues that the Court denied him a right to present a defense in making some of its evidentiary rulings. In reviewing the evidentiary rulings of which Saldana complains, the Court notes that it may "order a new trial only if it believes

that there is a serious danger that a miscarriage of justice has

occurred -- that is, that an innocent person has been convicted."

*United States v. Silveus*, 542 F.3d 993, 1004-05 (3d Cir. 2008)

(internal quotation marks and citation omitted). As such, the

evidence which this Court refused to admit must be of a caliber

to indicate Saldana's innocence.

### a. Exhibit 1 - Ayala's motor vehicle registration

Saldana argues that the Court erred in failing to admit his

defense exhibit 1, the motor vehicle registration for Ayala's

car. Saldana states that the exhibit was important because "it

put a face to Mr. Germaine Ayala, a rasta man, and it also

established that he indeed was the owner of a brand new 2009

black Acura Sedan which was identified in government's exhibit

36a."

Government's exhibit 36a was a police report from the night

the rental car was seized. That report mentions the seized

rental car, and that it was in Motta's control. The report also

says that two of Motta's associates have been driving a new

Acura.

The only connection the excluded evidence showed between

Ayala and this case was that Ayala was an associate of Motta's.

However, that information was already in the record -- Motta had

testified that Ayala was his boss and his friend.  A motor

vehicle registration showing that Ayala owned an Acura would, at

best, have confirmed what exhibit 36a said, and what Motta had

said, that Motta had an associate who drove an Acura.

Saldana does not make a cogent argument of how this

information was relevant.  Even assuming *arguendo* that the

evidence was relevant, that relevance would have been outweighed

by the very real potential for juror confusion of the issues.  As

such, it was properly excluded under Federal Rule of Evidence

403.

> **b.   Exhibit 2 - Intelligence Unit's intra division**
> **procedures**

The Court declined to admit defense exhibit 2, the

Intelligence Unit's intra-division procedures ("SOP").  Saldana's

entire argument about why the Court should have admitted the

document is that the exhibit "was likewise important as it was

the only written document existing that addressed the Objectives,

Duties and Responsibilities of the Criminal Investigation Bureau,

Intelligence Unit." (Saldana's Mot. for acquittal, arrest of

judgment, new trial 32.)  While this argument implies that the

exhibit may have provided background information regarding

Saldana's public authority defense, it fails to identify how the

exhibit was relevant.

Further, at trial Saldana failed to establish that the
document fell under the business records hearsay exception
codified in Federal Rule of Evidence 803(6).  Saldana himself
wrote the document, and there was no evidence that it was
formalized or adopted by the VIPD.  As such, the document lacked
the trustworthiness normally associated with records regularly
generated in the course of business activity, and was properly
excluded.

### c. Exhibit 13 - US inspector general's report

Saldana argues that the Court's exclusion of a report of the
inspector general "was detrimental to the development of
Defendant's case [because] it addressed the issue whether the
Virgin Islands Police Department maintains appropriate measures
to protect the integrity of evidence." (*Id.*)  To the extent that
the report showed that there were concerns about evidence
handling processes at the VIPD, it was duplicative of testimony
given during trial.  Further, admission of the report ran the
risk of confusing the jury about which issues were properly
before it. *See United States v. McRae*, 210 Fed. Appx. 171, 172
(3d Cir. 2006) (unpublished) (affirming exclusion of police
report regarding issue not before the jury because "reference to

an unrelated report could have opened the door to a discussion of
the details of the other reported incident and thereby confused
the jury.").  The Court took that possibility of confusion into
account in conducting a Rule 403 assessment, and the exhibit was
properly excluded.

### d. Declaration of unavailability of Raphael Rivera

Saldana further contends that the Court's refusal to declare
witness Raphael Rivera ("Rivera") unavailable was an abuse of
discretion.  Rivera testified at the first trial of this matter,
and was cross examined.  Saldana states that his process server
"indicated difficulty in locating Mr. Rivera for service" for the
retrial.

However, Saldana failed to obtain a subpoena for Rivera with
the correct trial date.  The Court declined to declare Rivera
unavailable because a subpoena with the correct trial date was
never issued for him.

Saldana argues that the cumulative effect of the foregoing
evidentiary rulings deprived him of his right to present a
complete defense.  None of the rulings, however, were errors.
The Court simply prevented Saldana from presenting inadmissible,
irrelevant, and confusing evidence to the jury.  Further, Saldana
has not explained how any of the rulings individually, or all of

them cumulatively, would have indicated his innocence.

Accordingly, the Court will deny Saldana's rule 33 motion.

## C. Rule 34

Saldana argues that this Court lacked jurisdiction to hear

counts 5 and 6 because there was no possibility that the

extortion scheme could affect interstate commerce as required by

the Hobbs Act, 18 U.S.C. § 1951.

As noted in the Rule 29 section of this opinion, the Seventh

Circuit explained in *Marrero*, 299 F.3d at 654-55, the "depletion

of assets" theory of Hobbs Act jurisdiction. Like this case,

*Marrero* was a case in which commerce in counterfeit drugs was

affected.

In that case, the defendants lured drug dealers to meet them

on the pretext of selling them cocaine, when in fact they only

had some flour with a thin coating of cocaine on top. *Id*. at 654-

55. The defendants then robbed the drug dealers of the $25,000

that the dealers had planned to use to purchase the "cocaine".

*Id.* at 654.

The Seventh Circuit explained that a Hobbs Act robbery

conviction could stand because:

> Had the defendants not lured the Detroit dealers to
> Chicago, those dealers would have used their $ 25,000
> to buy cocaine elsewhere, and that purchase, a
> transaction in commerce whether it would have been made

> in Detroit or elsewhere because, as we said, all
> cocaine originates overseas, thus was thwarted, and
> commerce therefore obstructed, by the robbery.

*Id.* at 654-55.

Here the facts are a mirror image of the facts in *Marrero*.
Rather than $25,000, aimed at buying what was in fact fake
cocaine, being removed from the stream of commerce, a brick of
fake cocaine itself was removed from the stream of commerce.

In this case, Motta would likely have found a buyer for his
fake cocaine. Once the fake brick of cocaine was off the market
following its seizure by the VIPD, Motta's potential buyers
likely turned to some other source to meet their cocaine demand.
As the *Marrero* court points out, all cocaine originates outside
the United States. As such, interstate commerce in cocaine was
potentially affected when Saldana and the other defendants
removed Motta's brick of fake cocaine from the market because
Motta's potential buyers probably bought cocaine from someone
else instead.

In *Marrero*, a transaction in interstate commerce was
thwarted by the removal of $25,000 from the cocaine market. In
this case, a transaction in interstate commerce was facilitated
by the removal of fake cocaine from the market. However, the
foregoing is a distinction without a difference in that Hobbs Act

jurisdiction may rely on a mere potential effect on interstate commerce. *United States v. Urban*, 404 F.3d 754, 764-765 (3d Cir. 2005). It makes no difference whether that affect is the thwarting or the facilitating of such commerce.

Accordingly, the Court did have jurisdiction to hear counts 6 and 7, and Saldana's Rule 34 motion will be denied.

## IV. <u>CONCLUSION</u>

For the reasons given above, the Court will deny Saldana's motion for acquittal, a new trial, or arrest of judgment. An appropriate order accompanies this memorandum opinion.

S\_____

**CURTIS V. GÓMEZ**
**Chief Judge**